STATE of Missouri, Respondent,

v.

Michael TAYLOR, Appellant.

No. SC 85235.

Supreme Court of Missouri,
En Banc.

May 11, 2004.

Rehearing Denied June 8, 2004.

Rosemary E. Percival, Office of the State Public Defender, Kansas City, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Evan J. Buchheim, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

RONNIE L. WHITE, Chief Justice.

## I.

A jury convicted Appellant, Michael Taylor, of one count of first-degree murder and recommended the death sentence. Judgment was entered consistent with the jury's recommendation. Appellant now appeals raising nine points of error. This Court has jurisdiction pursuant to Mo. Const. art. V, sec. 3. Affirmed.

## II.

The facts, which this Court reviews in the light most favorable to the verdict,[1] are as follows:

In 1998, Appellant was convicted of first-degree murder and forcible rape and was sentenced to life in prison without probation or parole. Appellant was incarcerated at Potosi Correctional Center and was required to share a cell with Shackrein Thomas. At approximately 7:30 p.m. on October 3, 1999, Appellant placed Mr. Thomas in a chokehold and strangled him to death. Just prior to the routine ten p.m. inmate "count," Appellant summoned the guards to his cell where they discovered Mr. Thomas' body.

Mr. Thomas' body was found on the cell floor with a bite mark in the middle of his back. His right eye had been nearly dislodged from the eye socket. There were abrasions present to his abdomen and left cheek, and his left eye was swollen. There was also evidence that the two men had engaged in sexual activity at some time prior to the murder. Appellant stated to a department of corrections investigator that his "father" from the "dark side" had instructed him to "send" Mr. Thomas to him.

At trial, Appellant's defense was that he suffered from a mental disease or defect that excused him from responsibility for killing Mr. Thomas. Consequently, the guilt phase evidence primarily consisted of expert testimony as to Appellant's mental status. The jury rejected his insanity defense, found Appellant guilty of first degree murder, and after the sentencing phase of the trial unanimously recommended a sentence of death.

## III.

■ In Appellant's first point, he contends that the trial court erred when overruling defense counsel's objection to giving the jury Instruction No. 5, patterned after MAI–CR 3d 306.04. Appellant believes this instruction may have caused the jurors to believe that they could not consider whether he had a mental disease or defect.

Expert testimony concerning Appellant's mental status was adduced from several experts. The conclusions of these experts were based upon the direct examination of Appellant, as well as the review of pertinent records, statements and the conclusions of other individuals. Statements made by the accused and the information reviewed by these experts is generally not admissible on the issue of whether the accused actually committed the act charged; however, this information is admissible on the issue of a defendant's mental condition.[2] To be sure the jury understands the purpose of this evidence, the trial court is required to give the MAI–CR 3d 306.04 instruction.

■ The Missouri Approved Instruction CR 3d 306.04 states:

---

1. *State v. Christeson,* 50 S.W.3d 251, 257 (Mo. banc 2001).

2. Section 552.030.5. All statutory references are to RSMo 2000 unless otherwise specified.

You will recall that certain doctors testified to statements that they said were made to them and information that they said has been received by them during or in connection with their inquiry into the mental condition of the defendant. In that connection, the Court instructs you that under no circumstances should you consider that testimony as evidence that the defendant did or did not commit the acts charged against him.

The failure of a trial court to give a required instruction is error.[3] The instruction clearly informs the jury that it may only use the evidence identified to determine the defendant's mental state and not his guilt or innocence. It does not instruct the jury to disregard the evidence completely when determining the Appellant's mental condition as he alleges.

On a claim of instructional error, "[a]n appellate court will reverse only if there is error in submitting an instruction and prejudice to the defendant."[4] Even assuming, arguendo, that the trial court erred by not allowing Appellant to waive the instruction, Appellant provides only speculation as to the prejudicial effect of this proper instruction. Having failed to demonstrate prejudice, Appellant's claim is without merit.

## IV.

Appellant also argues that the trial court erred by overruling his objection to the prosecutor's cross-examination of Appellant's expert, Dr. John Rabun, concerning the details of Appellant's previous conviction. Appellant contends that the testimony elicited from the prosecutor's questioning was inadmissible evidence of an uncharged crime that was neither logically relevant nor necessary to prove the charge against him.[5]

"Generally, evidence of prior bad acts or crimes is inadmissible unless logically and legally relevant to the present charge."[6] However, Dr. Rabun had testified that he had reviewed the records of Appellant's prior rape and murder when forming his opinion of Appellant's mental state, and an expert witness may be cross-examined about facts not in evidence to test the validity of his opinion. "Where a psychological expert's opinion of mental illness is before the court, the validity and weight of the opinion may be tested on cross-examination concerning the expert's knowledge of fact surrounding the defendant's mental status, including the accused's past interactions that bear on the opinion. This necessarily implies wide latitude in cross-examining such experts to test the factual basis for the opinion."[7] Trial courts retain broad discretion in deciding the permissible scope of cross-examination, and an appellate court will not reverse a conviction absent an abuse of that discretion.[8]

Dr. Rabun testified that he believed the Appellant suffered from paranoid schizophrenia and that Appellant had committed both the previous and present murders after hearing voices. The prosecutor's cross-examination, which did not exceed the scope of the permitted examination as

---

3. Rule 28.02(a) and (f). See also *State v. Roberts*, 948 S.W.2d 577, 587 (Mo. banc 1997).

4. *Id.* See also *State v. Taylor*, 944 S.W.2d 925, 936 (Mo. banc 1997).

5. *State v. Reese*, 364 Mo. 1221, 274 S.W.2d 304, 307 (Mo.1954).

6. *State v. Goodwin*, 43 S.W.3d 805, 817 (Mo. banc 2001).

7. *Id.*

8. *Id.*

determined in a pre-trial conference, challenged the expert's opinion in terms of attempting to establish a motive for the killings. The prosecutor's questions concerned the similarities between the murders in that both involved death by asphyxiation and the circumstances in both implied that sex might have been the motivating factor as opposed to a schizophrenic disorder. Moreover, since Appellant had admitted his guilt, this evidence could not have been used inappropriately to prove Appellant's propensity to commit the crime charged. The trial court did not abuse its discretion when permitting the cross-examination.

### V.

Appellant next claims that the trial court erred when denying his motion to order two psychiatric care centers to disclose the mental health records of the State's witness, Scott Perschbacher, so they could be entered into evidence or else viewed *in camera* to determine their relevancy. Appellant suggests that these records were necessary to determine the competency of the State's witness and to deny him access to those records violated his rights to due process, confrontation, cross-examination and freedom from cruel and unusual punishment.

The abuse of discretion standard applies when reviewing claims of denial of meaningful discovery and con-

cerning the relevancy and admissibility of evidence.[9] "A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration."[10] "If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion."[11]

When reviewing a claim that a defendant was denied meaningful discovery, the appellate court will determine whether the trial court abused its discretion in such a way as to result in fundamental unfairness.[12] "Fundamental unfairness occurs when the state's failure to disclose results in defendant's genuine surprise and the surprise prevents meaningful efforts to consider and prepare a strategy for addressing the evidence."[13] However, a "defendant is not entitled to information on the mere possibility that it might be helpful, but must make 'some plausible showing' how the information would have been material and favorable."[14]

Appellant asserts that the records in dispute *might* have had a bearing on Mr. Perschbacher's competency to testify, but there is a presumption that a witness is competent to testify unless that witness exhibits some mental infirmity *and* fails to meet the traditional criteria for witness competence.[15] The mere possibili-

---

**9.** *State v. Tokar*, 918 S.W.2d 753, 770 (Mo. banc 1996); *State v. Tisius*, 92 S.W.3d 751, 762 (Mo. banc 2002).

**10.** *In re Care and Treatment of Spencer*, 123 S.W.3d 166, 167–69 (Mo. banc 2003).

**11.** *Id.*

**12.** *State v. Tisius*, 92 S.W.3d 751, 762 (Mo. banc 2002).

**13.** *Id.*

**14.** *State v. Goodwin*, 65 S.W.3d 17, 21 (Mo. App.2001).

**15.** *State v. Robinson*, 835 S.W.2d 303, 307 (Mo. banc 1992). A witness is competent to testify if the witness shows "(1) a present understanding of, or the ability to understand upon instruction, the obligation to speak the truth; (2) the capacity to observe the occurrence about which testimony is sought; (3) the capacity to remember the occurrence about which testimony is sought; and (4) the

ty, not supported by fact, that the records from these facilities might contain evidence concerning Mr. Perschbacher's competence is insufficient to have rendered the trial court's decision to deny discovery and admission of these records as being an abuse of discretion.

## VI.

In his fourth point, Appellant claims the trial court erred by allowing the prosecutor to make speaking objections during defense counsel's penalty phase closing argument. Appellant asserts that these objections encouraged the jury to speculate about matters not in the record, that they amounted to the prosecutor giving testimony, and that they implied the defense had hidden facts from the jury.

■■■■ At issue are three specific objections made by the prosecutor. The first was an objection for a "blatant misstatement of the evidence." The second occurred when defense counsel informed the jury that if the Appellant were excused from guilt by reason of insanity that he would be sent to Fulton State Hospital. The prosecutor objected because this was material that defense counsel specifically insisted not be in the jury instructions. The third objection was made when defense counsel asked the jury to speculate as to why the appellant would be prescribed medication for schizophrenia if he did not have mental problems. The prosecutor objected stating "that calls for speculation beyond the record. There may be very good reasons that are not in evidence."

Contrary to Appellant's claims, these are perfectly legitimate objections that the trial court exercised its discretion over to

sustain. Appellant attempts to analogize this case to that of *State v. Greene* where the court of appeals determined that statements made in the prosecutor's closing rebuttal argument intimated that defense counsel lied or intentionally attempted to mislead the jury without a basis in the record.[16] Here, the situation is reversed because the prosecutor's objections involve the defense's argument going beyond the record or misstating the evidence.

■■■■ "The trial court has broad discretion in controlling the scope of closing argument and the court's rulings will be cause for reversal only upon a showing of abuse of discretion resulting in prejudice to the defendant. In order for a prosecutor's statements to have such a decisive effect, there must be a reasonable probability that the verdict would have been different had the error not been committed."[17] The prosecutor's objections did not amount to an inappropriate argument that defense counsel lied or was attempting to mislead the jury. Appellant fails to demonstrate any prejudice, beyond speculation, resulting from these properly lodged objections.

## VII.

■■■■ Appellant claims that the trial court abused its discretion by not allowing the jurors to take notes during the case. Appellant requested that the jurors be allowed to take notes related to the complex nature of the case and the fact that several expert witnesses would be providing testimony. The prosecutor argued that he believed note-taking would distract the jury and that they would not listen as well to the evidence presented.

capacity to translate the occurrence into words." *Id.*

**16.** 820 S.W.2d 345, 346–47 (Mo.App.1991).

**17.** *State v. Williams,* 97 S.W.3d 462, 474–75 (Mo. banc 2003).

Rule 27.08 makes clear that allowing juror note-taking lies purely within the discretion of the trial court.[18] The trial court's decision to not allow note-taking was not clearly against the logic of the circumstances and was not so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.

## VIII.

In Appellant's sixth point, he claims that the trial court plainly erred by not *sua sponte* instructing the jury that it could not impose the death sentence if it found him to be mentally retarded. Appellant bases his claim on this Court's decision in *Johnson v. State*,[19] which held that the United States Supreme Court case of *Atkins v. Virginia*, rendering the death penalty unsuitable for a mentally retarded criminal, must be applied retroactively.[20]

Prior to the holding in *Atkins*, the Missouri legislature passed section 565.030 providing that a defendant convicted of first-degree murder was ineligible for the death sentence if the jury found, by a preponderance of the evidence, that the defendant was mentally retarded. However, this statute expressly provided that it only applied to offenses committed on or after August 28, 2001. Missouri's patterned jury instruction, formulated in compliance with this statute, was adopted on September 1, 2003, and while mandated for cases following this date, the instruction excused courts of error for not using it prior to its inception.[21]

The murder of Mr. Thomas occurred on October 3, 1999. However, Appellant contends that despite the fact that section 565.030 was limited to crimes committed after August 28, 2001, and despite the fact that Missouri's patterned instruction was not applicable until September 1, 2003, that the trial court was still required to instruct the jury that a determination of mental retardation precluded a death sentence.

Even though section 565.030 is inapplicable and Missouri's pattern instruction was not formulated at the time of Appellant's trial, it is true that the *Atkins* decision is to be applied retroactively. Appellant, however, failed to request or proffer a jury instruction on this issue waiving all but plain error review.[22] "To establish that the instructional error rose to the level of plain error, appellant must demonstrate that the trial court so misdirected or failed to instruct the jury that it is evident that the instructional error affected the jury's verdict."[23]

The only evidence that Appellant presented regarding mental retardation was videotaped testimony from Dr. Ahsan

18. The discretionary standard remains unchanged from before January 1, 1997, when Rule 27.08 took effect. See *State v. Trujillo*, 869 S.W.2d 844 (Mo.App.1994). "In the event that the trial court concludes that good cause dictates that note-taking should not be allowed in a particular case, it is within the court's discretion to prohibit it. The trial court should as well have the authority to allow note-taking when, in its judgment, notes would be helpful and aid the jury members to perform their duties in determining the facts." *Id.* at 850.

19. 102 S.W.3d 535 (Mo. banc 2003).

20. *Johnson*, 102 S.W.3d at 540–41; see also *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

21. See MAI–CR 3d 300.03A, 313.38, 313.40, 313.48A.

22. See Rule 28.03 and 20.30.

23. *State v. Baker*, 103 S.W.3d 711, 723 (Mo. banc 2003).

Syed, a psychiatrist and department of corrections consultant. Dr. Syed testified that he interviewed the Appellant on two occasions for a total of forty-five minutes and that he performed a "quick review" of Appellant's records. He further testified that Appellant functioned in the borderline range of intellectual ability, but he had not performed any intelligence or cognitive function tests of any kind. Appellant also makes the conclusory statement that he has numerous poor adaptive skills related to aggressive and disruptive behavior, his need for special education at an early age, and the sexual abuse he claims to have suffered at the hands of his schoolmates.

Missouri's statutory definition of mental retardation does not include a numerical score for intelligence testing, but rather defines it as:

[A] condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which conditions are manifested and documented before eighteen years of age.[24]

Dr. Richard Scott, the state's witness, testified that he not only examined the Appellant when formulating his expert opinion, but also administered intelligence testing. Dr. Scott found the Appellant to be in the low average range of intelligence and reported no evidence that revealed any deficit or limitation in Appellant's adaptive behaviors.

Appellant's sparse evidence was insufficient to support an instruction on mental retardation. Based upon the evidence in the record, no reasonable juror could have found that Appellant was mentally retarded, and the trial court did not plainly error by not instructing the jury on this issue.

## IX.

In his seventh point, Appellant claims that the trial court abused its discretion when overruling his objection to strike venireperson Janette Salmon for cause. The relevant standard of review for the trial court's actions concerning striking a venireperson for cause were discussed by this Court at length in *State v. Smith*.[25] In *Smith*, he Court stated:

Venirepersons may be excluded from the jury when their views would prevent or substantially impair the performance of their duties as jurors in accordance with the court's instructions and their oaths. A challenge for cause will be sustained if it appears that the venireperson cannot consider the entire range of punishment, apply the proper burden of proof, or otherwise follow the court's instructions in a first degree murder case. The trial court is in the best position to evaluate a venireperson's commitment to follow the law and is vested with broad discretion in determining the qualifications of prospective jurors. The trial court's "ruling on a challenge for cause will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion." A juror's equivocation about his ability to follow the law in a capital case together with an equivocal statement that he could not sign a verdict of death can provide a basis for the

---

24. RSMo 565.030.6.

25. *State v. Smith*, 32 S.W.3d 532, 544 (Mo. banc 2000).

trial court to exclude the venireperson from the jury.[26]

In response to the prosecutor's questions, venireperson Salmon stated that after a great deal of thought she would not be able to vote for the death penalty. She stated that the only time she could consider such a penalty would be in the incident of "a mass murderer or something like—something like at the Towers." Ms. Salmon further stated that the fact that Appellant committed a prior murder would not change her mind. It was not required that she be questioned further, as Appellant argues, to determine if she could still follow the trial court's instructions and vote for the death penalty. The trial court did not abuse its discretion when sustaining the prosecutor's motion to strike.

### X.

■ Appellant next claims that the trial court plainly erred when submitting penalty phase instructions numbers 16 and 17. He contends that these instructions did not inform the jury that the State bore the burden of proving aggravating circumstances beyond a reasonable doubt and that mitigating circumstances were insufficient to outweigh the evidence of aggravating circumstances. Appellant believes the wording of the instructions could have allowed the jury to infer that the burden of proof was not beyond a reasonable doubt. Having not raised this issue at trial, review is under the plain error standard.[27]

Instructions 16 and 17 were appropriately patterned after MAI–CR 3d 313.40,

313.41, and 313.44. Instruction 16 specifically includes the "beyond a reasonable doubt" standard in its language. The "beyond a reasonable doubt" language is also present in instruction 15, the preparatory instruction for requiring the findings of the aggravating circumstances listed by the prosecution.[28] The aggravating circumstance the prosecutor listed in the jury instructions was Appellant's prior first-degree murder conviction—a conviction already dependent upon a finding of guilt beyond a reasonable doubt. Moreover, Appellant offers no case on point or statutory requirement that the prosecutor has the burden to demonstrate that the mitigating circumstances must be insufficient to outweigh aggravating circumstance.

To establish that the instructional error rose to the level of plain error, appellant must demonstrate that the trial court so misdirected or failed to instruct the jury that it is evident the instructional error affected the jury's verdict.[29] Appellant offers only conclusory statements and speculation that the alleged error in instruction would have influenced the jury's verdict. The MAI instructions are constitutional, and there was no plain error in law with their delivery to the jury.[30]

### XI.

■ Appellant finally argues that the trial court lacked jurisdiction and authority to sentence Appellant because the state failed to charge him with "aggravated first-degree murder." Appellant claims that failure to plead facts, as listed in

---

26. *Id.*

27. Rule 30.20.

28. This instruction was also modeled after MAI–CR 3d 313.40. Instruction number 12 also stated that the jury must find the presence of the aggravating circumstance beyond a reasonable doubt.

29. *State v. Baker,* 103 S.W.3d 711, 723 (Mo. banc 2003).

30. *Lyons v. State,* 39 S.W.3d 32, 43 (Mo. banc 2001).

section 565.030.4, creates a charge of murder whereby the maximum penalty was life in prison.

With regard to the charging document, this Court has addressed this claim numerous times before. The omission of statutory aggravators from an indictment charging the defendant with first-degree murder does not deprive the sentencing court of jurisdiction to impose the death penalty.[31] Missouri's statutory scheme recognizes a single offense of murder with maximum sentence of death, and the requirement that aggravating facts or circumstances be present to warrant imposition of death penalty did not have the effect of increasing the maximum penalty for the offense.[32] Having examined this claim thoroughly and finding no error of law, an extended opinion on these issues would have no precedential value.[33]

## XII.

This Court independently reviews the proportionality of all death sentences. Under section 565.035.3, RSMo 2000, this Court is required to determine whether:

(1) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of section 565.032 and any other circumstance found;

(3) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

Having thoroughly reviewed the record, this Court concludes that there is no evidence to suggest that the punishment imposed was a product of passion, prejudice, or any other arbitrary factor.

■ The trial court's findings are next reviewed to determine if the evidence supports, beyond a reasonable doubt, the existence of an aggravating circumstance and any other circumstance found. In this case, the jury unanimously found one statutory aggravating circumstance as a basis for considering the death sentence. The evidence supports, beyond a reasonable doubt, a finding that the Appellant had a prior first-degree murder conviction on April 3, 1998.[34]

Finally, this Court has upheld sentences of death in similar cases where the defendant committed a prior murder and/or a serious assaultive offense and then murdered again.[35] The death sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant.

## XIII.

The judgment is affirmed.

All concur.

---

**31.** *State v. Cole,* 71 S.W.3d 163, 171 (Mo. banc 2002).

**32.** *Id.* See also *State v. Tisius,* 92 S.W.3d 751, 766 (Mo. banc 2002).

**33.** Rule 30.25.

**34.** Section 565.032.2(1).

**35.** *State v. Mayes,* 63 S.W.3d 615 (Mo. banc 2001); *Skillicorn v. State,* 22 S.W.3d 678 (Mo. banc 2000); *State v. Middleton,* 998 S.W.2d 520 (Mo. banc 1999); *State v. Hunter,* 840 S.W.2d 850 (Mo. banc 1992); *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992).